IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 752 |
| v. | ) | |
| | ) | Judge Wayne R. Andersen |
| TYRONE GRANT | ) | |

### NOTICE OF FILING

**To:RYAN HEDGES**
Assistant U.S. Attorney
219 S. Dearborn, 5th Fl
Chicago IL 60604

**DANIELLE STERN**
U.S. Probation Officer
55 E. Monroe, Ste 1500
Chicago IL 60603

Please take notice that on this 1st day of February, 2010, the undersigned filed the following document(s) in the above captioned cause, a copy of which is attached hereto:

### DEFENDANT GRANT'S OBJECTIONS TO THE PSR

Respectfully Submitted,

FEDERAL DEFENDER PROGRAM
Carol A. Brook,
Executive Director

By:  s/ Helen J. Kim

55 E. Monroe, Ste. 2800
Chicago, IL  60603
(312) 621-8344

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 752 |
| v. | ) | |
| | ) | Honorable Wayne R. Andersen |
| TYRONE GRANT | ) | |

## DEFENDANT GRANT'S OBJECTIONS TO THE PSR

Defendant TYRONE GRANT, by the Federal Defender Program and its attorney HELEN J. KIM, respectfully submits his objection to the Presentence Report ("PSR") prepared in this case by Probation Officer Danielle Stern. Specifically, we are objecting to the PSR's proposed applicability of a two-level enhancement pursuant to the advisory United States Sentencing Guideline ("Guideline") § 3C1.1, and we are also objecting to the PSR's recommendation that Mr. Grant not receive a three-level reduction pursuant to Guideline § 3E1.1. In support of our position, we state the following:

## I. THE PSR RECOMMENDS AN OBSTRUCTION ENHANCEMENT AND DENIES MR. GRANT CREDIT FOR ACCEPTANCE OF RESPONSIBILITY.

The PSR seeks a two-level enhancement to Mr. Grant's base offense level pursuant to Guideline § 3C1.1. It states that this enhancement is applicable in this case because "[d]uring the competency evaluation, the defendant was diagnosed with malingering, and the evaluation noted that the defendant may have feigned a mental illness in order to avoid prosecution and/or reduce his sentence." *See* PSR at 7.

The PSR further states that the "defendant's conduct during the evaluation attempted to

impede and obstruct the investigation, prosecution, or sentencing of the instant offense." *Id.*

Based on its application of Guideline § 3C1.1, the PSR also denied Mr. Grant a three-level

Acceptance of Responsibility reduction under Guideline § 3E1.1. *Id.* In this regard, the PSR

states that the reduction is inapplicable because the defendant's conduct during the competency

evaluation "negates the defendant's timely, complete, and truthful plea of guilty." *Id.* Moreover,

it appears that commentary note 4 to § 3E1.1 largely influenced the PSR's failure to apply a

reduction under this section, which states:

> Conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding
> the Administration of Justice) ordinarily indicates that the defendant has not
> accepted responsibility for his criminal conduct. There may, however, be
> extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may
> apply.

## II.   MR. GRANT'S CONDUCT DOES NOT WARRANT THE OBSTRUCTION OF JUSTICE ENHANCEMENT.

The PSR applied the two-level obstruction of justice enhancement based on the fact that

Mr. Grant "*may* have feigned mental illness." PSR at 7. This statement, in turn, is tied to the

Government's Version of the Offense, attached to the PSR, where the government presents a

written argument for why Mr. Grant should receive an enhancement for obstruction and be

denied credit for acceptance of responsibility.

Mr. Grant's conduct during the competency evaluation does not meet the requirements of

Guideline § 3C1.1 because (1) the obstructive conduct did not relate to Mr. Grant's offense of

conviction and relevant conduct as is necessary under the section; (2) Mr. Grant's mental

condition is still in question despite the diagnosis given by Dr. Dana, a Bureau of Prisons

employee; (3) the government cannot show that Mr. Grant possessed the specific intent required

for the section to apply; and (4) even if the Court were to find, by a preponderance of the evidence, that other elements for the enhancement do apply, the government's evidence of "obstruction" has not been demonstrated to tie to any avoidance of prosecution or sentencing. Therefore, the government's evidence does not support the application of the enhancement.

**A.   U.S.S.G. § 3C1.1 Requirements.**

Guideline § 3C1.1 provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

The application notes of Guideline § 3C1.1 set forth the following for a court to consider when determining whether a defendant obstructed or impeded the administration of justice. Specifically, note 2 provides:

> In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

Additionally, however, while the United States Sentencing Guidelines do not define "obstruct," application note 4 to Guideline § 3C1.1 provides examples of the type of conduct that would warrant an obstruction enhancement compared to the type of conduct that would not warrant an increase:

> (a) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;

4

(b) committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction;

(c) producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding;

(d) destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender;

(e) escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding;

(f) providing materially false information to a judge or magistrate;

(g) providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense;

(h) providing materially false information to a probation officer in respect to a presentence or other investigation for the court;

(i) other conduct prohibited by obstruction of justice provisions under Title 18, United States Code;

(j) failing to comply with a restraining order or injunction issued pursuant to 21 U.S.C. § 853(e) or with an order to repatriate property issued pursuant to 21 U.S.C. § 853(p);

<blockquote>
(k) threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction.
</blockquote>

Finally, note 5 provides a list of conduct which would ordinarily result in no obstruction enhancement being applied, including:

<blockquote>
(a) providing a false name or identification document at arrest, except where such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense;

(b) making false statements, not under oath, to law enforcement officers, unless Application Note 4(g) above applies;

(c) providing incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation;

(d) avoiding or fleeing from arrest (see, however, § 3C1.2 (Reckless Endangerment During Flight));

(e) lying to a probation or pretrial services officer about defendant's drug use while on pre-trial release, although such conduct may be a factor in determining whether to reduce the defendant's sentence under § 3E1.1 (Acceptance of Responsibility).
</blockquote>

**B.**   **The results of the competency evaluation do not relate to the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense as required under § 3C1.1.**

In this case, Mr. Grant's actions did not constitute an obstruction of justice nor did it significantly impede the official investigation, prosecution, or sentencing of the instant offense. Therefore, his conduct is excluded from Guideline § 3C1.1. As Guideline § 3C1.1 does not *per se* apply to defendant's who are diagnosed with malingering, the Court must make specific findings to support a ruling in favor of the government. *United States v. Greer*, 158 F.3d 228, 241 (5th Cir. 1998); *United States v. Dunnigan*, 507 U.S. 87 (1993). In fact, the Seventh Circuit has said that the Court must make explicit and independent findings that Mr. Grant actually had

6

the specific intent to obstruct justice. *United States v. Gage*, 183 F.3d 711, 716-17 (7th Cir. 1999) (citations omitted). It is the government's burden to prove that the enhancement is warranted, even by a preponderance of the evidence. *United States v. Noble*, 246 F.3d 946, 953 (7th Cir. 2001); *United States v. Ewing*, 129 F.3d 430, 434 (7th Cir. 1997). Yet whether or not the enhancement applies to a case where a diagnosis of malingering has been given is a case of *res nova* in the Seventh Circuit.

Moreover, the case law is extremely sparse from other Circuit Courts of Appeal where malingering was found to be obstructive conduct. Although the government has cited cases from the Third, Fifth and Eleventh Circuits, Mr. Grant's conduct is distinguishable from those cases. U.S. Version at 16. For example, in *Batista*, the defendant's conduct "required substantial expenditures of government resources and the district court's time," as, over the period of two years, he "was evaluated on at least five occasions," and he specifically informed his co-defendant that he would be feigning mental illness in order to avoid standing trial. *United States v. Batista*, 483 F.3d 193, 195 (3d Cir. 2007). Similarly, in *Greer*, there was a significant amount of time, great expense and much delay caused by the defendant's conduct. In *Greer*, the defendant willfully feigned mental illness throughout his case trial, only modifying his behavior after the court told him that his actions would not convince experts that he was insane. *Greer*, 158 F.3d at 238. Also, in *United States v. Patti*, 337 F.3d 1317 (11th Cir. 2003), the defendant's malingering resulted in the postponement of his "trial for a year and forced the government to waste time and resources in evaluating his competency." *Patti*, 337 F.3d at 1325. By contrast, Mr. Grant's conduct here resulted in one evaluation that was performed by one doctor at the Metropolitan Correctional Center.

In cases involving mental illness, the Court "must closely scrutinize the record to ensure that the basis for the obstruction enhancement is the sort of calculated attempt to derail justice that evidences a desire to avoid the authority of the court or to escape the commands of the law." *Greer*, 158 F.3d at 239. Both defense counsel and the government have an obligation to raise the issue of an individual's competency if either have any doubts in that regard. *United States ex rel. Rivers v. Franzen*, 692 F.2d 491, 499 (7th Cir. 1982) ("The failure of defendant or his counsel to raise the competency issue is persuasive evidence that there was no bona fide doubt as to [defendant's] competency"). This case is unlike those referenced by the government in both the strength and magnitude of the evidence. But the facts of this case also support the Court's denial of the enhancement as well.

As the government states in its Version, Mr. Grant robbed the South Shore Bank near 35th and King Drive, in Chicago, by demanding money and displaying a knife with a large blade. U.S. Version at 3. When two security guards, both armed with guns, saw the robbery and told Mr. Grant to stop, he said, "Shoot me, motherfucker." He then walked away. He did not run. An armed guard followed after Mr. Grant, repeatedly ordering him to stop, but Mr. Grant was never phased. He kept walking. Then, as the government states, "[he] began tossing money in the air from his black bag with his left hand and threw the knife on the ground with his right hand." U.S. Version at 4. Later, at the police station, Mr. Grant truthfully told the agents that he had been in Tinley Park Hospital, but he was not taking any prescribed medications that day. *See* Exhibit A. He also told the agents that he was acting because of "dead people" telling him to do something. The government apparently believes these actions were part of a larger, devised scheme by Mr. Grant to get some other result that would be more appropriately classified as

fraud involving government benefits. Yet for that reason alone, Mr. Grant should not receive the obstruction of justice enhancement because Mr. Grant's "obstructionist actions," those alleged to have occurred during his competency evaluation, must go to the administration of justice with respect to the investigation, prosecution, or sentencing *of the instant offense of conviction* under § 3C1.1.

The government cannot show that Mr. Grant's bank robbery was part of a common scheme or plan in connection to an attempt to defraud the government. Nor can it show how any of his behaviors are part of the same course of conduct, or sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses, as is described in § 1B1.3, note 9, pertaining to relevant conduct. After citing a number of telephone conversations recorded, collected and used by the government through Dr. Dana, an employee of the Bureau of Prisons, it states (U.S. Version at 13):

> This conversation is alarming on several levels. First, defendant's statements lay bare his devious plan: rely upon a feigned "diagnosis" of mental illness in order to receive a minimal custodial sentence from the Court, ideally to be served in a medical facility, and then collect SSI benefits going forward and retroactively to December 2007. (Footnote omitted in this recitation.) Second, the conversation suggests that defendant committed the instant bank robbery as part of his effort "to try and make somethin' happen" with his application for SSI benefits.

The government also claims that Mr. Grant's "malingering is a blatant manipulation of the Court's psychiatric evaluation process and a conscious, calculated effort to avoid trial or obtain a reduced sentence." U.S. Version at 14. It cannot back that statement with very much.

To believe that Mr. Grant had a grander plan – to defraud Social Security by getting a false diagnosis that he could later use to obtain government benefits – is illogical and outlandish.

9

The government's logic would be that Mr. Grant actually robbed a bank with a great amount of foresight. He went into the bank where there were armed guards. He put himself in jeopardy of getting shot or killed as he walked away despite being told to stop. He illogically threw money into the air, then made false statements of delusion to the police officers knowing that he would then be prosecuted for a crime and he would likely have to serve time in jail. He may have also been able to anticipate that he would get a lawyer who would ask for a competency evaluation on his behalf, it would seem. As this would be the way for him to try to deceive an unknown psychiatrist into diagnosing him with a psychiatric disorder. He would later use this diagnosis – after he served his jail time – to secure "unentitled" Social Security benefits. Indeed, even if Mr. Grant were to have done all those things with that scheme in mind, real mental issues are there that should be identified and treated.

More importantly, however, Mr. Grant has a true and documented history of mental illness, which included a diagnosis of schizophrenia. Nothing that Dr. Dana states in his report can take away from its validity. As it states in the PSR, Mr. Grant has multiple active warrants. PSR, cover page. He has had cases in the criminal system since the age of fourteen. PSR at 8-23. He told Officer Stern that he has had problems since he was a child. PSR at 24. He was hospitalized for one month in Mississippi State Hospital in May 2008. PSR at 24. During this time, he received and took medication for schizophrenia. As those records show, there were circumstances that led to his involuntary, not voluntary, commitment. He also spoke of things quite similar to those things he reported to Dr. Dana at that time. *See* Exhibit B (Under Seal). There is no reason to doubt the credibility of the doctors who were treating him for that one month period of time.

10

Mr. Grant also received follow-up care at Yazoo City Mental Health Center for almost two months. PSR at 26. He participated in an Intake/Assessment, and in that report, it states that *he had applied for disability in Mississippi* – his case was pending there. *See* Exhibit C, at 2 (Under Seal).[1] He received five home visits by a Mental Health Therapist assigned to his case, and a Medical Director at Yazoo County prescribed Mr. Grant Risperdal, Trilephon and Klonopin. The therapist repeatedly wrote of Mr. Grant's financial difficulties that interfered with his ability to afford his prescribed medication. *See* 8-13-08 and 8-19-08 Progress Notes. Yet by August 28, 2008, she reported that Mr. Grant delusional and had auditory hallucinations. *See* 8-28-08 Progress Note. His mother, who had been involved in the therapist's meetings with Mr. Grant, was unable to afford one medication but would do so at the beginning of the next month when she received her own SSI check. *Id., see also* 8-11-08 Progress Note. Importantly, at this point, when Mr. Grant "really appears to be decompensating," he left Mississippi. He did not tell anyone where he was going. In fact, Mr. Grant ended up in Chicago, at which time he contacted his brother. They had not seen each other in over one year.

While his brother allowed Mr. Grant to stay with him for two days, he says that Mr. Grant was not taking any medication. He also said that Mr. Grant talked of wanting to "jump in Lake Michigan" and how he "wanted everyone to die." Tension quickly grew in the home, and Mr. Grant left without telling his brother where he would go. He ended up at the Pacific Gardens homeless shelter. Then, according to Tinley Park Mental Health Center reports, from there he went to the ER of Ingall Memorial Hospital on September 13, 2008. That hospital referred him

---

[1] While it is unknown if that application remains active, Mr. Grant states that he believes it is still pending, and he does not know if he was or was not approved for Mississippi benefits.

to Tinley Park Mental Health Center. *See* Exhibit D (Under Seal). He arrived with an examination that was 'significant for experiencing hallucinations and delusions." *Id.*, at 1-2. While he was "on frequent observations" for the first two days, the next four he was not.

The Tinley Park Hospital discharge report states that Mr. Grant's "complaints of auditory hallucinations ceased once he discovered he was not going to be provided with the benefits he was expecting in Illinois." A doctor also gives Mr. Grant a discharge diagnoses of both psychotic disorder and malingering. The doctor claimed Mr. Grant "may be malingering/ exaggerating issues,"[2] yet a social worker note states that Mr. Grant requested to be discharged back to the Pacific Garden program. We know that Mr. Grant robbed the South Shore Bank two days later, on September 22, 2008. We also know that he did receive six days of Risperdone and Lorazepam, while he was at Tinley Park, but he was not taking any medication at the time he committed the bank robbery. Instead, after Mr. Grant went to Kankakee Jail, he was put back on Risperdal on September 25, 2008. *See* Exhibit E (Under Seal). Although mis-diagnosed as being "bipolar I disorder," the notes show that Mr. Grant stopped taking the medication again due to the unpleasant side effects. On January 5, 2009, Mr. Grant was moved to the Metropolitan Correctional Center in order to be evaluated by Dr. Dana. In Dr. Dana's report, it states that Mr. Grant was on Risperdal since his admittance to the MCC in January. *See* Dr. Dana's Report at 6.

There must be some question in this Court's mind as to whether or not Mr. Grant was actually malingering when he was placed at the MCC for a competency evaluation. Mr. Grant had a real and undisputed prior diagnosis and time of treatment in Yazoo City and Mississippi

---

[2] In part of the report, it states that "pt may be malingering for SSA/SSI – unclear." It also states, elsewhere, that Mr. Grant "appears to be at last malingering or embellishing his current symptoms in order to obtain shelter & may be fabricating them all in an effort to get SSI."

State Hospital. There also must be some question as to whether or not Mr. Grant was even a malingerer at the time that he admitted himself to Tinley Park as he had been off his medication. Once again, the government's claim that Mr. Grant went to Tinley Park as a rouse to receive Social Security benefits makes little to no sense if his application for benefits was in Mississippi, not Illinois. Moreover, that hospitalization followed a documented period of time that he was at home, then he had a rise in abnormal behavior immediately prior to leaving Mississippi and arriving in Chicago. All of this must be viewed in its proper context. When Mr. Grant went to Tinley Park Hospital, he was homeless, penniless and without medication. Of huge relevance is the fact that he was again off his medication when he committed this bank robbery.

Equally important is the fact that Mr. Grant's behaviors stem back to when he was a teenager. Certainly no one can say he was a malingerer then. On October 28, 2009, Melissa Vacchiano, a M.S.W. Intern at the Federal Defender Program, interviewed Mr. Grant's mother, who lives in Mississippi. During that interview, the mother stated things that were completely untied to anything that would be connected to her son's supposed malingering. *See* Exhibit F. She spoke of Mr. Grant's odd behaviors as a child, but also spoke of worrisome behaviors he displayed as an adult. In a telephone conversation on October 27, 2008, she stated, "if he doesn't take his meds he is out of control." She also stated, when asked if there was any history of mental illness in the family, that her sister and aunt were both hospitalized at Whitfield for mental disorders.

Mr. Grant's aunt, who was also interviewed by phone, similarly said that she has personally seen a disturbing side of Mr. Grant "since he was little." *See* Exhibit G. Then, on November 2, 2009, Ms. Vacchiano was able to speak with Mr. Grant's brother. *See* Exhibit H.

13

Once again, Mr. Grant's brother described Mr. Grant when he was younger and those descriptions reveal that Mr. Grant was more than likely struggling with some mental disorders. On November 6, 2009, Mr. Grant's grandmother, too, spoke of Mr. Grant's issues. *See* Exhibit I. These descriptions clearly go far back enough to discredit any notion of Mr. Grant's desire to commit fraud on the government. Yet they also must result in some question of the malingering diagnosis given to Mr. Grant by Tinley Park and Dr. Dana.

The government cannot show that Mr. Grant had a specific intent to obstruct the investigation, delay trial or affect his sentencing by acting consciously with the purpose of obstructing justice, or that he acted deliberately or intentionally, as opposed to negligently, inadvertently, or accidentally. *U.S. v. Kosmel*, 272 F.3d 501 (7th Cir. 2001). The obstruction enhancement only applies to "willful" attempts to obstruct or impede the administration of justice. *U.S. v. Polland*, 994 F.2d 1262 (7th Cir. 1993). The very fact that defense counsel, not Mr. Grant, requested the competency evaluation weighs against a finding that he had the specific intent required as a finding under Guideline § 3C1.1. Yet the finding that Mr. Grant acted in a willful manner to obstruct justice is impossible here because of his actual and real history of mental illness and bizarre behavior.

Finally, we submit that a review of the telephone conversations used as a basis for the diagnosis of malingering shows that even if the Court were to agree, partially, with the government's arguments about Mr. Grant's behaviors, his actual intent was never to escape punishment. He repeatedly states that he wants to get the case over, he wants to serve his

sentence, and then he wants to move on with his life.[3] While in one conversation Mr. Grant did say that he thought he may be able to go to a mental health facility to serve his sentence, he also has numerous recorded conversations where he says his hope is for three or four years, but he knows he may end up with five or six. U.S. Version at 9, 11, 12. It is a legitimate request to ask a court for a lessor sentence based on presented mitigation at the time of sentencing that includes mental health history. The government's statement that the "defendant clearly hoped that his 'medical condition' would result in leniency from the Court does nothing to show why the obstructionist enhancement should now apply. In fact, it undermines the government's theory that this was some plan devised to get some unentitled benefit from SSI.

## II.    EVEN IF THE COURT APPLIES THE OBSTRUCTION OF JUSTICE ENHANCEMENT, MR. GRANT'S ACCEPTANCE OF RESPONSIBILITY SHOULD REMAIN IN EFFECT.

Even if the Court were to find against Mr. Grant on the enhancement for Obstruction of Justice, it should not deny Mr. Grant credit for Acceptance of Responsibility under Guideline § 3E1.1. Specifically, the PSR states that Mr. Grant should not receive the acceptance of responsibility adjustment because there is evidence that Mr. Grant feigned a mental illness during the competency evaluation. PSR at 7. It appears that Officer Stern believes his "conduct negates the defendant's timely, complete, and truthful plea of guilty." PSR at 7. Nevertheless, Mr. Grant has fully and clearly accepted responsibility, and he should receive a reduction in his sentence under Guideline § 3E1.1 for the reasons presented above. Even if this Court were to find that

---

[3] In one conversation, Mr. Grant states "I want to get to the joint [i.e. prison], so I can put my feet up and relax." In other conversations, he states that he wants to get through the sentencing proceedings in order for the clock to start running, allowing him to be closer to his release date.

Mr. Grant did, in fact, have the specific intent to obstruct justice, however, there is "nothing inherently inconsistent with finding that a defendant who at one point obstructed an investigation later regretted that action and accepted responsibility for the offense." Fed. Sent. L. Prac. § 3E1.1 (2009).

Put differently, although there may be a presumption that a defendant is not accepting responsibility if he or she receives the obstruction enhancement under § 3C1.1, this case is not the presumption is rebutted in this case. U.S.S.G. § 3E1.1, Application Note 4; *United States v. Branch*, 195 F.3d 928, 937 (7th Cir. 1999); *United States v. Ewing*, 129 F.3d 430, 435 (7th Cir. 1997); *United States v. Lallemand*, 989 F.2d 936, 938 (7th Cir. 1993) (explaining that a defendant can obstruct or attempt to obstruct justice at time "t" and later accept responsibility at time "t + 1"). "[C]redit for acceptance of responsibility may be given even if, at some earlier time, a defendant did or said something inconsistent with acceptance of responsibility." *United States v. Anderson*, 259 F. 3d 853, 862 (7th Cir. 2001).

At virtually every stage, Mr. Grant has accepted responsibility for the offense. Mr. Grant made post-arrest statements admitting to the commission of the bank robbery. While initially entering a plea of not guilty, the request for an evaluation was made by Mr. Grant's counsel, not him. *Pate v. Robinson*, 383 U.S. 375 (1966). After receiving the competency results, Mr. Grant plead guilty. Any alleged obstructive conduct then ceased. Notably, the PSR fails to show any indication that Mr. Grant was feigning incompetence during the interview or made any materially false statements. Mr. Grant discussed his history of mental diagnoses and described his current medications, all of which is documented in medical records from Mississippi State Hospital, Yazoo City Mental Health Center, and Tinley Park Mental Health Center. PSR at 25-27. Mr.

Grant never made misleading statements as to his mental condition, and the PSR does not make any statement that Mr. Grant was malingering during the interview.

The PSR fails to demonstrate how Mr. Grant's diagnosis of malingering during the competency evaluation negated his "timely, complete, and truthful plea of guilty," and his continued conduct indicating that he has accepted full responsibility for the offense. Instead, it appears that the PSR's reliance is entirely on the government's Version of the Offense which states that a "guilty plea alone is not sufficiently 'extraordinary' to overcome [Mr. Grant's] behavior," citing to *United States v. Batista*, 483 F.3d 193, 198 (3rd Cir. 2007). Yet again, this case is distinguishable from *Batista* as the defendant's obstructive behavior in *Batista* was that "beyond the mere exploration or presentation of a defense of mental incompetence." *Batista*, 483 F.3d at 198. Moreover, based on the evidence, it is clear that this is one of those extraordinary cases where, as the commentary notes state, § 3E1.1 can still apply despite a possible finding that § 3C1.1 applies.

WHEREFORE, for all the reasons stated, we ask for the specific finding that Mr. Grant did not willfully obstruct justice under § 3C1.1, and therefore, not apply the two-level enhancement recommended in the PSR. We also ask the Court find that Mr. Grant is eligible for credit under § 3E1.1 (a) and (b), thereby lowering his score by three levels. Therefore, we submit that Mr. Grant's adjusted offense level should be 22, which, matched with a criminal history category of III, results in an advisory range of 51 to 63 months in prison.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Carol A. Brook,
Executive Director

By:_____s/ Helen J. Kim_____

55 E. Monroe Street, Suite 2800
Chicago, IL 60603
312/621-8344

## CERTIFICATE OF SERVICE

The undersigned, HELEN J. KIM , an attorney with the Federal Defender Program

hereby certifies that in accordance with FED.R.CIV.P5, LR5.5, and the General Order on

Electronic Case Filing (ECF), the following document(s):


## DEFENDANT GRANT'S OBJECTIONS TO THE PSR


was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by

first-class mail/hand delivery on  February 1 , 2010, to counsel/parties that are non-ECF filers,

including:


Danielle Stern
U.S. Probation Officer
55 E. Monroe, Suite 1500
Chicago IL 60603


By:      s/ Helen J. Kim

FEDERAL DEFENDER PROGRAM
55 E. Monroe St., Suite 2800
Chicago, Illinois 60603
(312) 621-8344

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
)     No. 08 CR 752
v. )
)     Judge Wayne R. Andersen
TYRONE GRANT )

## EXHIBITS TO DEFENDANT GRANT'S OBJECTIONS TO THE PSR

EXHIBIT A

EXHIBIT B     Under Seal

EXHIBIT C     Under Seal

EXHIBIT D     Under Seal

EXHIBIT E     Under Seal

EXHIBIT F

EXHIBIT G

EXHIBIT H

EXHIBIT I

# EXHIBIT A

D-302 (Rev. 10-6-95)

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    09/24/2008

TYRONE GRANT, date of birth of _____, social security account number of _____, was interviewed at District 01 of the Chicago Police Department. GRANT was provided with an "Advice of Rights" form, which he read the first line aloud and the remainder of the form to himself. GRANT stated he understood his rights as explained on the form. GRANT signed the form acknowledging the waiver of his rights. After being advised of the investigating agents' identities and the purpose of the interview, GRANT agreed to voluntarily provide the following information:

GRANT was in the care of TINLEY PARK HOSPITAL until three to four days ago where he received treatment for his paranoid schizophrenia. GRANT has not been taking his medication since his release from the hospital. GRANT has resided at the PACIFIC GARDEN MISSION located at _____, Chicago, Illinois, since leaving the hospital.

GRANT stated, "the dead people made me do it, " in response to being asked why he robbed a bank earlier that day. GRANT spoke incoherently regarding the ability to communicate and see dead people. GRANT made numerous references throughout the interview to the movie, "The Matrix," and admitted he was the main character of the story, Neo.

GRANT stated that on the morning of the bank robbery he utilized public transportation to travel to his brother's residence located at _____, Markham, Illinois. GRANT retrieved a knife from his brother's residence with the intention of robbing a bank. GRANT traveled to the bank from his brother's residence utilizing the "Markham bus" to 95th, the train from 95th to 35th, and the bus to King drive. GRANT walked into the bank, handed the teller a note, and told her to give him the money. GRANT drafted the note while riding on the bus to the bank. The note read, "Put the money in the bag." Upon seeing the note, the teller panicked and ran away. GRANT approached a second teller at the adjacent teller's counter. GRANT ordered the teller to give him money and displayed the knife obtained from his brother's residence. The teller placed the money in GRANT's black bag. GRANT grabbed the bag from the counter and walked out of the bank. GRANT observed a security guard following him from the bank. The

---

Investigation on   09/22/2008   at   Chicago, Illinois

File #   91A-CG-129430                                      Date dictated _____

SA Thomas Weber
by   SA Charles E. Adam:cea

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

security guard stated, "You are not going to get away. Give it up." GRANT walked toward White Castle and threw the money into the air. GRANT was then arrested. GRANT provided no explanation as to why he threw the money in the air.

The following is descriptive and biographical information for TYRONE GRANT:

|                  |                       |
|------------------|-----------------------|
| GENDER/RACE:     | Male/Black            |
| HEIGHT:          | 6'6"                  |
| WEIGHT:          | 275 lbs               |
| HAIR:            | Black                 |
| EYES:            | Brown                 |
| TATTOOS:         | "ARIES" - right bicep |
| DATE OF BIRTH:   |                       |
| SSN:             |                       |
| FBI#:            |                       |

TG    20

# EXHIBIT B

# UNDER SEAL

**EXHIBIT C**

**UNDER SEAL**

# EXHIBIT D

# UNDER SEAL

# EXHIBIT E

# UNDER SEAL

**EXHIBIT F**

# INTERVIEW SUMMARY

| | |
|---|---|
| **To:** | Helen Kim |
| **From:** | Melissa Vacchiano, M.S.W. Intern |
| **Case File:** | Tyrone Grant |
| **Re:** | Interview with Thelma Gene Grant |
| **Date of Report:** | October 28, 2009 |

**Time and Place :** 10:00 a.m. via telephone conversation

**Content of Interview:** I spoke with Tyrone's mother, Ms. Thelma Gene Grant for 20 minutes on the telephone this morning to acquire some type of information regarding her son. She reported that Tyrone was a terrible child and that he had a terrible childhood. She insisted that she had a normal birth with Tyrone and that all of his milestones were intact. However, she did say that there were a few incidents, during his infancy and childhood, where her and Tyrone had been victimized by her now deceased ex-husband. She reported during one specific incident that her and Tyrone had been thrown and locked out of the house while it was freezing and snowy. She stated that they were not let back in until some time had passed. Ms. Grant stated that Mr. Grant was a very angry and abusive man that had put her into the hospital several times for repeated and severe physical abuse. She also stated that she did not want Tyrone to turn into a "fruitcake" like his father. Nonetheless, she told me that he continued down the same path. Tyrone was always a "terrible" and "angry" person who destroyed property and cussed everyone out all the time. She said she had tried to get him counseling on several occasions, however, it did not work. Tyrone never got along or socialized with anyone in his childhood except someone by the name of Marshall Stanton (whom she stated we should contact).

As Tyrone grew older, her never got along with his father or any other family member for that matter. He used to pick fights with his cousins, aunts, grandmother, and mother, saying that he had an urgency to "kill all of them." Ms. Grant believes that there is no relationship between Tyrone and his brother, Andre. The two brothers moved to Chicago in 2007-2008 and Andre broke the lease on their apartment because he "couldn't stand" Tyrone any longer and that Tyrone also threatened to kill him. She remembers Tyrone going into Stateville Mental Health Institution for a period of 3-4 months, but only getting released because they could not help him there.

She also reported that Tyrone would have trouble sleeping and stay up all night either cooking or talking to himself. Many times, she would have to wake him up because he would cry during is sleep. Tyrone also drew many pictures of devils and stood outside in the rain by himself. It must also be noted that Ms. Grant had a bit of trouble when it came to remembering dates or time periods of several events.

# EXHIBIT G

# INTERVIEW SUMMARY

**To:**    Helen Kim
**From:**   Melissa Vacchiano, M.S.W. Intern
**Case File:**   Tyrone Grant
**Re:**    Interview with Ms. Mandy Bradfield
**Date of Report:** October 28, 2009

**Time and Place:** 10:30 a.m. via telephone conversation

**Content of Interview:** Originally, I had spoke to Ms. Thelma Gene Grant who referenced Tyrone's aunt, Ms. Mandy Bradfield as credible source to interview. Ms. Bradfield was eager to speak with me regarding Tyrone and his case. She reported that in Tyrone's childhood he was a "trouble-maker," "problem child," and an "evil little boy" who was "always getting into something." He would fight with several of his cousins, and, on one specific occasion had picked up a female cousin by her hair and swung her around "like a rag doll." She reported various times in which Ms. Bradfield and Ms. Grant attempted to discipline Tyrone without a successful outcome. Ms. Bradfield stated that Tyrone would often "beat up" on his mother if he didn't like what was said or asked of him.

She also stated that Tyrone's father was an alcoholic and never around, however, when he did surface, situations would often become violent. On one occasion, Tyrone's father tried to come in through the screen window of Tyrone's bedroom where he was asleep, in his crib during infancy, in an attempt to abduct his son. Mr. Grant was caught by Ms. Bradfield's step-father and pulled out a gun in attempts to shoot. Nothing further was discussed on that situation.

Ms. Bradfield also stated that Tyrone had little to no friendships. He liked to keep to himself in his bedroom where she would many times hear Tyrone talking to himself. She also stated that Tyrone "picked on" not only other children, but adults as well. At one point she described him as two different people: good and evil. She stated that he had a problem with alcohol and when he was intoxicated, his anger became extreme. She related him to his father several times during the phone conversation and stated that, at times, she was scared of Tyrone, but sometimes he was "okay." Ms. Bradfield believes that Tyrone has been "disturbed since he was little."

# EXHIBIT H

# INTERVIEW SUMMARY

| | |
|---|---|
| **To:** | Helen Kim |
| **From:** | Melissa Vacchiano, M.S.W. Intern |
| **Case File:** | Tyrone Grant |
| **Re:** | Interview with Andre Grant |
| **Date of Report:** | November 2, 2009 |

**Time and Place :** 9:15 a.m. via telephone conversation

**Content of Interview:** I spoke with Tyrone's brother, Mr. Andre Grant, for 15 minutes on a telephone conversation. I asked him a number of questions regarding Tyrone's life from childhood to the present. His input was rather vague, but there are a few responses that are worth noting. The first thing I asked Andre was about him and his brother's childhood. He reported that Tyrone was generally a good kid, however, when things did not go his way he had "a lot of attitude" toward specific individuals, mainly him and his mother. He also reported that Tyrone wasn't really that bad and that they got along fairly well when they lived with one another. Both boys continuously moved back and forth from Mississippi (with their grandmother) to Chicago, so their time together was always cut short. Their mother was extremely strict with the two boys, however, when I asked him to elaborate he responded, "I don't really know." He said that Tyrone has a different father than him (not knowing who his father actually was) and that Tyrone's father had passed earlier this year.

I then asked if Tyrone had ever had any type of injuries or illnesses as a child, and Andre responded that Tyrone would talk to himself a lot. I asked for an example and Andre stated that on one specific occasion, he remembers Tyrone exclaiming that, "a flock of birds were flying over his house to come and get him." He reported that Tyrone did this very often around Andre and that he heard him do it by himself as well. The most often phrase that may have (Andre stated) suggesting Tyrone had something wrong with him was, "the devil told me to do things."

Tyrone was never involved in any gang activities and was never highly religious. Both of the boys were raised as Baptist, but were never forced to go to church with their mother. So why does Tyrone talk about the devil and God so much? I asked Andre if Tyrone had ever had a steady job and he told me that there was a job Tyrone had for approximately 3-4 years at a fabric material factory at 48th and California.

Andre also stated that Tyrone drank alcohol, but was never a heavy drinker. When asked about marijuana, Andre said that he does not think his brother ever "smoked weed." Andre said that he and his wife had given Tyrone a place to stay when he came back from Mississippi for a while, however, his wife became scared of him and forced Tyrone to move out a short time thereafter. When living with Tyrone, Andre stated that he would ask for money and he ate a lot, but had no job to support himself. Tyrone, then, went back to Mississippi for a while and returned back in Chicago where he resided in a homeless shelter. He reported talking to him when he was in the shelter.

# EXHIBIT I

# INTERVIEW SUMMARY

**To:**               Helen Kim
**From:**             Melissa Vacchiano, M.S.W. Intern
**Case File:**        Tyrone Grant
**Re:**               Interview with Ms. Velma Granderson
**Date of Report:**   November 6, 2009

**Time and Place:** 2:30 p.m. via telephone conversation


**Content of Interview:** After interviewing Mr. Tyrone Grant, he gave me the approval to contact his grandmother, Ms. Velma Granderson. It should be noted that Tyrone has had no contact with her in several years.

The interview was 15 minutes and I began the interview by asking what her relationship was like with Tyrone when he lived with her in Mississippi for one year. Her attitudes toward Mr. Grant were mostly negative, however, she did state that when Tyrone was very young (ages 2-9) her was an extremely pleasant and happy little boy. Ms. Granderson stated that when Tyrone lived with her he was a "nasty boy and has a nasty attitude." She reported that he "always said he wanted to kill everyone" and would act like a "punk" when he was confronted on how he would carry out his plan. She then stated that she would "never take him back in because he was crazy." She also told me the story that correlated with Thelma and Mandy's story about the incident of Tyrone's father shooting her husband in the arm in efforts to abduct Tyrone from his crib. Velma also stated that Tyrone acted like his father and reported that he "had the crazy" as well.

Then she went on to report that Tyrone would sit up in his room and talk to the television. When she asked him why he was doing this, he responded that he "isn't crazy" and the people in the television are crazy. I must note that while he was residing with her, she reported believing he was never on any type of drug or drank any alcohol. Velma also said that he would always sit in the front yard under a large tree and "talk to himself." She said she believes that his brother, Andre, "don't fool with him" because of his behaviors and that Tyrone never had any friends because they all believed he was "crazy."